Mr. Adams. Thank you, Your Honor. Good morning. I am Eric Adams and I am here today representing Pressure Systems International Inc., who I will just refer to as PSI. There are two issues that I really wanted to get to today for the Court. One is the latches issue, which I think is the key issue on this appeal, and then the other one is Ingram's unclean hands. And for purposes of this argument, I'll just refer to the AIRGO entities and Ingram as Ingram just for simplicity's sake. Latches and Ingram's unclean hands are intertwined in this case because it was Ingram who kept Bradley, the omitted inventor, from finding out the truth that Bradley's contributions were made a part of the patents at issue in this case. You know, I've scrutinized this record. I've been through this several times. It looks like everybody has unclean hands in this case. I don't agree with that for PSI, Your Honor. The fact is, and I'm happy to go into it and explain how Ingram hid the truth from Bradley. And it may help, and it would certainly help me, if you address latches separately from unclean hands. Take latches first, and if you could go through the elements and explain why the Court was wrong in its decision. Yes, Your Honor. For latches, of course, there has to be an unexcusable or unreasonable delay, first of all, then there has to be material prejudice. In order for there to be a delay, there had to be some notice to Bradley that his contributions were made a part of these patents at issue. He testified that he did not have actual notice until February of 2007 when he was approached about his role in talking to Ingram. That's his testimony, and of secret recording that happened here. Okay. And explain why that was not noticed. Well, the secret recording has to be looked at in the context of what was going on. Ingram went to Southwest Research, where Bradley worked. Southwest Research, of course, had an agreement with PSI. They were doing contract work for us. Ingram goes to Southwest Research after he was fired from PSI, and he puts a recording device in his bag. And he says, look, I've been fired from PSI. I want to compete with them. I want to develop my own product. He's got a couple of rough sketches, and they're going back and forth, and he's getting ideas and contributions from Bradley. Bradley doesn't know that everything he's saying is being memorialized on a tape recording that Ingram's going to be able to keep and review and go through in detail. So during the conversation Ingram said, my point is, there's opportunities for people that, you know, if you want to be part of this thing, if you want in on the patent, and he goes on, if I can get this thing patented in time, and then he talks about getting a concept patent, isn't that noticed? I think that's noticed that at some point in the future he may be seeking a patent on these ideas. But it's not clear, is he going to include Bradley's contributions? Is it just going to be on Ingram's ideas? And the fact that he's actually offering and telling him this, makes it seem you're a friend of mine. I'm getting some ideas from you. You know, if there's a patent, we're going to be working together on this. And that in and of itself makes Bradley think, well, why would he have to inquire? Why would he suspect that Ingram would be stealing his ideas and putting them into a patent? Because he's telling... But that's not... I don't think that's the issue, is it? It's not whether Ingram thought that he was stealing some ideas or anything. The issue here is notice as to whether a patent existed or was about to be filed or come into existence. Isn't that the issue? Well, I think the test is... I think I agree with Your Honor, but I want to make sure that I'm thinking the test is the same as the court. The test is whether Bradley had actual notice or would have reasonably been expected to inquire about whether Ingram used his ideas in a patent that was going to be filed or that had been filed. And at that point in time, in July of 1997, when that secret recording took place, there was no indication about what the patent was going to cover, whether he was actually going to get a patent or file a patent application. He hadn't even met with a patent attorney. It wasn't clear what it was going to be on. And none of this was being written down. From Bradley's point of view, if he's sitting in a room and he's just talking about ideas, it's not clear that these specific ideas he's sharing are actually going to be memorialized and put into some kind of patent application. And the fact that Ingram is going to, as Ingram says in the secret recording, get him involved in anything that takes place down the road doesn't lead Bradley to suspect that his contributions at this point in time are going to be in some patent later on and that he's not going to be told about it. The district court looked at the secret recording issue. The district court looked at it and said, well, let's go back a little bit. I think that the standard is under advanced cardiovascular and it's whether an individual could have reasonably been expected to inquire about the subject matter. So Ingram tells Bradley, I've got this idea, do you want in on this? There's great opportunities for you. I'm going to patent this. He says, do you want in on the patent? If I can get this patent in time, that's not enough to trigger Bradley to say, well, what patent are you talking about? What are we dealing with here? Well, the conversation, within the context of the conversation, Ingram's sharing his possible plan. And he's saying, I want to compete with PSI. I've got all this experience. They're sharing ideas about what's going to go into the patent. And he does refer to the fact that he's going to go, I believe he says, he's going to go talk to a patent attorney, see if there's anything possible about this. And the fact is, he never follows up. There's nothing to indicate that he ever went back to Bradley and said, I did file a patent application on this. We had talked about it. I was going to get you involved and I did file a patent application on this. There's nothing to indicate that Bradley had any idea that a patent application incorporating his ideas was filed and actually been issued by the Patent Office. He testified he didn't know until February of 2007. Well, he knew there was a patent in 2008. He knew that Ingram had been issued a patent. He didn't know what it was on. He never looked at it. He said that he didn't know. Curiosity wasn't piqued having discussed getting a patent in the prior conversation. Well, the prior conversation had taken place over two years before that. And the fact is, Ingram had had an earlier patent, I think it was in 1995 or 1996, that had been issued in his name. The fact that these engineers, these people in this industry, had some patent issues, I don't think necessarily by itself would indicate, oh, that must be, he must have taken my ideas. I need to go look at it. Especially when he still considered Ingram a friend according to his testament. So, these are engineers that have been involved in the patent world. They're involved in the area of discovery. One says, come with me. Let's compete against your master. Come in and join in on this patent. How can that be an abuse of discretion by the court below to find that there was notice? Or at least that there was enough to pique an inquiry. He should have asked. Well, there's nothing just in knowing, I'm going to go back to this. I don't think there's anything, just the fact that Ingram got a patent in the year 2000, that would lead him to think, that patent must have my ideas. I must go check it out. I must take the time to go look and review and see if he actually took my ideas. In this time frame, he's still communicating with Ingram. He had the initial meeting in July of 1997 with Ingram. After that initial meeting, he did some drawings for him. After he retired from Southwest Research in 2001, he went back and worked with Ingram in 2003. So, there's nothing in the evidence or in what's been testified to that would indicate there was a need for any suspicion on behalf of Bradley as to what Ingram was doing. Well, later on, there was an email and Bradley said in the email, this is back in 2004, just keep in mind that the current Rotary Union was my design back in 1998. Yes, Your Honor. And if you look at the context that I emailed, and it's apparent from looking at just what Bradley wrote, there had been some disagreements, name-calling. Ingram apparently was not happy with some of the testing that Bradley had done, and he's pointing out, look, I did make some contributions here. I mean, you can't say that the work I've been doing is not good. I'm the one that came up with this design that we're looking at. But the fact that he came up with these ideas and they're developing a product is separate from whether Ingram has gone off on the side and gotten some patents on these same ideas. I see I'm just into my rebuttal time. I'm happy to answer any further questions, but otherwise, I'd like to reserve my time. Okay, thank you. We save your rebuttal time, Mr. Adder. Thank you, Your Honor. Mr. Oldham. Thank you, Your Honor. May it please the court, my name is Jeff Oldham, I represent the Applebee's. This appeal involves just three issues, straightforward legal issues that are firmly settled under the court's case law, and that's all the court has to decide to affirm this appeal. It's remand, latches, and the interpretation of the Southwest Research Contract. Like counsel, I'll skip straight to latches since that seems to be the main issue. It's been glossed over, although Your Honor's pointed out that this is an abuse of discretion standard. What the district court did here was take undisputed facts, so there's no allegation that the summary judgment standard affects this appeal, undisputed facts, and based on that, applied his discretion to find that there was latches in this case, an unreasonable delay, and material prejudice. The only question I have about this is the exact timing on this. There's clearly a long length of time, but when is it? In terms of the delay? Of knowledge of the existence of the patent. Well, just focusing on inquiry notice, did he have a – would a reasonable person have inquired about the subject matter? In 1997, as Your Honor pointed out, Mr. Ingram was talking repeatedly, and in very specific terms. It was not general remarks. What he was saying was, I need to be able to invent something different, something fundamentally different so that we can patent it. We're going to go to a patent attorney. But where does Judge Hughes tell us that in his decision? Where does he nail down those dates that give us that? Well, he gives three data points. In 1997, then in 2000, you had Bradley admitting on page A706 of the record that he knew there was a patent. Given this conversation in 1997 and 2000, I think that's well more than sufficient evidence that in 2000, which is more than six years from the time when the patent – or excuse me, when the claim was brought, there was inquiry notice at that moment. And that's the six years the presumption would apply to that, and there's been no evidence to rebut that presumption. I think Judge Hughes then added a final backstop in 2003 that Mr. Bradley was actually working for Ergo on these patents, testing them, and doing improvements on them in 2003. And certainly at that point in time, he had beyond inquiry notice of any rights that he might have as an inventor. And so I think there it would be under the six-year presumption. That's where I get the heartburn. I mean, I think it could be over six, it could be under six. Yes, you're right. You still have that. Yeah, and that's still a four-year period, and there's no authority to suggest that a district court on undisputed fact can't exercise its discretion on summary judgment to find that there's latches. And so I mean, summary judgment is there to deal with disputed fact. Let me take you on a different track here. And this goes to whether we even have jurisdiction over this particular case, whether there's sufficient federal question involving an issue of patent law involved. Once a district court found latches, that resolves the issue of validity and inventorship and ownership. Because doesn't the finding of latches by the district court negate having to find the enforceability of the different agreements that were at play? Well, and that is an issue I was going to raise, that the remand issue, to the extent the court, you know, didn't address it on the merits, arguably is moot in light of the latches finding. So I want you to tell me why we should not, why are we here in this case and not the Fifth Circuit? Well, because you have to remember how the procedural process of this all started. There was, just before those, that case was removed to federal court, PSI went and filed a separate standalone section 256 in correction of inventorship action. That was properly before the district court, regardless of all the state court issues and regardless of the remand issue. So at the time when the district court ruled on inventorship under latches, I mean, there's just no dispute that he had a valid inventorship dispute in front of him. He ruled on the issue. I think the fact that he ruled on that issue may moot the remand issue in this case, but it doesn't deprive him of jurisdiction or this court of jurisdiction to review the inventorship dispute because there was a valid standalone federal inventorship dispute before the judge at the time when he ruled on it. Does that answer your court's question? Yeah, I may come back to that. Okay. And on latches, on material prejudice prong, there's really been no dispute on that whatsoever. The evidence shows that Ergo has invested over $6 million in these patents. Having to share with its competitor in this technology area would undoubtedly cause great prejudice to that. That's never really been disputed in this appeal. Based on the undisputed facts on the latches issue, there's simply no way to say that the district court's latches judgment was unreasonable. You know, one point worth making, I think, because a lot of times when you get into these latches cases, you have a certain claim of unfairness that a party might be an inventor and it's going to cause some unfairness, but there is absolutely no such claim that could be made in this case. What you actually had was a party that had known about the Ergo patents, was a competitor to Ergo, knew about these patents for years, knew before it got this assignment that there were consulting agreements between Ergo and Bradley. And what it did is it then went out and got a quick claim deed from the party for $2,500, as Judge Hughes put it, showing the value that was really behind it, when not even Bradley would stand up and say, I have rights to these patents. So there's no claim of unfairness in this case. I'll address the unclean hands issue as well. I think it's important to point out that all of the kind of innuendo and argument about Mr. Ingram having, you know, left PSI and competing with PSI and, you know, violating any responsibilities he had, that's already been litigated. That was litigated in the Oklahoma action and that was resolved in Mr. Ingram's favor, that he didn't violate any responsibilities he had. This was legitimate competition and there's never really any question about that. None of that's really relevant to this appeal. The only issue on the unclean hands exception to the latches which has been argued is whether Mr. Ingram had particularly egregious misconduct that somehow caused Bradley to delay in his inventorship claim. And the facts prove completely the opposite of that. The evidence shows, as Your Honors have pointed out, that Ingram told Bradley repeatedly in their taped conversation that he was going to go patent his concept. It then showed that they worked together for months, including Mr. Bradley doing drawings and, you know, being paid for it. And then finally, Ingram and Ergo employed Bradley for a full year in 2003 and 2004 to work on issues related to the 1845 patent. There's simply no way to say based on those facts that Mr. Ingram was concealing from Mr. Bradley any claim to inventorship or the patents themselves. And certainly you can't say on this record that the district court abused his discretion in finding that there was no unclean hands supporting some extreme exception from the latches requirement. The only other issue the court has to resolve, and it wasn't argued before, but I want to address it because it is an issue the district court found that he had to address because it kind of runs on a different track than the latches argument, is interpretation of the Southwest Research Contract. The argument there is that the Southwest Research Contract with PSI that was formed in 1993 created an automatic assignment of any rights that Bradley got through Southwest Research to PSI at the moment that they were created. And if that was true, then those rights would have, you know, been transferred in 1997, and so the latches issue would look different. Was Bradley still with Southwest when these events took place? Or he had retired, hadn't he? In 1997? Or you mean in 2007? Well, you're trying to tell us we need to interpret the Southwest statute. The contract. The argument that the district court said is that if it's an automatic assignment, then the assignment you know, whenever they were, the rights were created, and so PSI would have had those rights back then. And then the latches argument with PSI, since they didn't know until about 2006. Were there findings by the district court on those rights? I'm sorry? Were there findings by the district court on this relationship? I think the evidence showed that, I mean, the contract is in the record. Not what the evidence showed. I asked if there were findings. I'm sorry, what kind of findings? Well, you're telling us that we need to get into the Southwest relationship, assume that there was an automatic transfer of rights, and add another aspect that don't seem to have been explored in depth in the district court. Certainly, Your Honor, if the court feels that latches resolved the case, then you know, then that would be the only basis to is page A-10 of the record where the district court said that because the consulting contract, if it automatically assigned inventorship interest to systems, which is PSI, latches would not apply because PSI did not know that Bradley double crossed it until the secret recording was revealed in the Oklahoma litigation. If the court reaches that issue, though, it's a very straightforward legal issue firmly settled by this court's case law about, you know, agreements to agree versus present assignments. The IP venture case that Judge Newman authored talked about when language says agree to assign, that's a future agreement to agree, that's not a present assignment. This case is even clearer. It talks about shall agree, shall take certain actions. It even says that at the client's request, which is PSI, the parties will take these actions. There's no way to argue, I think, that that is an automatic and present assignment, and also the work that Mr. Bradley was doing was outside the scope of that, and we've briefed that. So if there's any other further questions that the court has? Just one question. Let's go back to the jurisdiction. Now, if we uphold the final latches, there's no inventorship issue left to decide, right? Correct. But the inventorship dispute, I mean, I think the inventors, the case is properly in federal court because inventorship is a, in terms of the remand issue, inventorship... I have no doubt it's properly in the federal court. I'm just wondering whether it's in the right one. I mean, we're applying latches and applying the law of the Fifth Circuit. Well, shouldn't they, and so the issue of inventorship doesn't appear to be ripe until that particular issue is resolved. Shouldn't the Fifth Circuit be looking at this case? No, I don't think that's right, Your Honor. I think that, I mean, and of course, you remember this case was in the Fifth Circuit, and they transferred the case here. They transferred the case to us. They transferred the case here, and I'm not suggesting that binds the court, you know, on their determination, but the fact of the matter is that inventorship is a federal question. It's in this court properly. It's in the federal courts properly, and although a defense barred it, as the Fifth Circuit said, if it didn't bar the case, then the inventorship would have to be in this case. And also, you know, the Fifth Circuit also relied on another mode of analysis, which is that, you know, if the district court made some comment that the inventorship issue was collaterally stopped, and the court said, well, if that isn't true, then we would have to address it, and so inventorship is here. In this case, it just, there's a defense that gets to it before the issue is squarely presented. No further questions? No further questions? We ask the attorney. Thank you, Your Honor. Excuse me. There is one thing I'd like to get back to. Of course, if there are any questions, I'll address those immediately, and that's getting back to the intertwining of the latches and the unclean hands, and the fact that when Ingram was fired from PSI, and he was going to Bradley for help in July 1997, he was in a catch-22 situation. Catch-22 was he needed Bradley's help on the one hand, but he also knew that any ideas or inventions that Bradley had were obligated to be assigned to PSI under the PSI Southwest contract. He knew that because he had signed the PSI contract with Southwest when he was president of PSI, and in fact, there had been an earlier invention by Bradley that had followed that process of being invented, being assigned from Southwest Research over to PSI. So the only way that Ingram could achieve his goals of competing with PSI in this industry of automatic tire inflation systems was if he was able to get these ideas, but keep it secret from the person he's trying to compete with. And so that's evidence of a motive to want to keep this information secret from Bradley, to get information from him, but keep it secret even from him. If he doesn't keep it secret, he can't compete, he can't achieve his goal. If he's trying to keep it secret, why did he hire him later on in 2004, 2003, 2004? He still needed his help, even then. He still couldn't make it work, he still needed Bradley's help, but he still wasn't telling Bradley, by the way, this is all these ideas and you know your ideas are in this product. He's not telling him that they've been patented. He doesn't know that. He testified he didn't know until February of 2007. He didn't know that the conversation back 10 years earlier had been recorded. He didn't know that there were patents on these things. And this also ties into the material prejudice aspect of the Latches, where if Ingram is keeping this from Bradley, then it's just not fair to come back and say, well, even though Ingram was keeping all this secret from Bradley, we're going to let him profit from that because he spent a lot of time and money on this. If he always knew that Bradley should get some credit for these patents, and that there was an obligation that anything that Bradley comes up with should go to PSI, he can't come back later and say, well, I knew all that, but you can't take it away from me because it would hurt me. And so for the Latches, it's our position that it should never have been granted, that it was an abuse of discretion, that there's no evidence to support that Bradley had notice, actual, or should have known, and that there is no material prejudice. If there aren't any other questions from the court. Any more questions? Okay, thank you, Mr. Adams, and thank you, Mr. Oden. The case is taken into submission. That concludes the argued cases for this morning. All rise.